UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BOBBY L. MILLER

                Plaintiff,                    CIVIL ACTION NO. 06-CV-11254-DT

      vs.                            DISTRICT JUDGE CORBETT O'MEARA

COMMISSIONER OF              MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

                Defendant.
_____/

REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

This Court recommends that Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 7), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 6), and that Plaintiff's complaint be **DISMISSED**.

## II.    PROCEDURAL HISTORY

This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

Plaintiff Bobby Miller filed an application for Disability Insurance Benefits (DIB) and Social Security Income Benefits ("SSI") in August 2002. (Tr. 65-71, 299-301). He alleged he had

been disabled since September 2, 200 due to bursitis in both of his knees, scoliosis, drug addiction, and depression. *Id.* Plaintiff's claim was initially denied in May 2003. (Tr. 54-58, 302-07). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 59). A hearing took place before ALJ Dean Metry on November 30, 2004. (Tr. 310-358). Plaintiff was represented at the hearing. (Tr. 52-53, 310). The ALJ denied Plaintiff's claims in an opinion issued on May 26, 2005. (Tr. 12-26). The Appeals Council denied review of the ALJ's decision on January 19, 2006 and the ALJ's decision is now the final decision of the Commissioner. (Tr. 5-8). Plaintiff appealed the denial of his claim to this Court, and both parties have filed motions for summary judgment.

## III.   THE ALJ'S FINDINGS

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of September 2, 2001. (Tr. 24). He further found that Plaintiff's impairments of residual right upper extremity pain due to remote gunshot wounds, scoliosis, reported bursitis of the knees, episodes of atypical chest pain, left calcaneal fracture, right ankle fracture, affective disorder, and polysubstance abuse disorder were severe but that they did not meet or medically equal a listed severe impairment. (Tr. 25). The ALJ also surmised that Plaintiff could not perform his past relevant work. *Id.* However, the ALJ concluded that between September 2, 2001 and August 4, 2004 Plaintiff retained the residual functioning capacity ("RFC") to perform a range of unskilled, light work. (Tr. 23). The ALJ also determined that as of August 4, 2004 Plaintiff had the RFC to: (1) sit for 6 hours in an 8-hour workday; (2) stand or walk for 2 hours

in an 8-hour workday; (3) lift/carry 10 pounds occasionally and lesser weights frequently; (4)

occasionally crouch, kneel, crawl, and work overhead with the right arm.  However, Plaintiff

could not use ladders, ropes, or scaffolds and he could only have incidental contact with the

public.  (Tr. 25).  Plaintiff's claim was denied because the ALJ determined that there were a

significant number of jobs available in the economy for a person of Plaintiff's age, educational

level, work experience and RFC during both periods in question.  *Id.*  Furthermore, the ALJ

determined that Plaintiff's allegations about his limitations were not totally credible.  *Id.*

IV.   **MEDICAL HISTORY**[1]

    A.   **Plaintiff's Post-August 3, 2004 Physical Health Treatment**

On August 4, 2004 Plaintiff was seen in the emergency room for bilateral ankle pain after

falling from a ladder.  (Tr. 197).  Tests showed a bimalleolar right ankle fracture and a left

calcaneal fracture.  (Tr. 198, 247, 252, 254, 256, 269).  He was subsequently admitted into the

hospital for treatment.  *Id.*  On August 5, 2004 Plaintiff underwent open reduction and internal

fixation of his right ankle.  (Tr. 200, 203).  The treating doctor noted that Plaintiff's left calcaneal

fracture would be reevaluated for surgical treatment after adequate soft tissue management. (Tr.

201).  The left ankle fracture was thereafter treated with a bulky splint.  (Tr. 195).  Plaintiff was

---

[1]   Plaintiff concedes that substantial evidence supports the ALJ's determination that he was not physically disabled prior to August 4, 2004 and had the RFC to perform unskilled, light work.  Plaintiff only challenges the ALJ's determinations that Plaintiff was not disabled between September 2, 2001 and the date of decision due to his mental disabilities and that Plaintiff was also not disabled as of August 4, 2004 due to the foot injuries he sustained on that date.  Therefore, only the medical records relevant to the issues on appeal are discussed herein.

released from the hospital on August 8, 2004. Plaintiff's discharge notes indicate that he was to be nonweightbearing as to both lower extremities and was to use a wheelchair for ambulation. (Tr. 195).

Plaintiff's left ankle was reexamined on August 12, 2004 by Dr. Robert Meehan. It was noted that Plaintiff had intact sensation in the medial, lateral, plantar, and first dorsal web space of his left lower extremity. A CT scan showed a large tongue type fracture of Plaintiff's left calcaneus. (Tr. 206). Dr. Meehan recommended that Plaintiff utilize an Ortho-last splint for protection and that he remain nonweightbearing on his left lower extremity. Physical therapy was prescribed. (Tr. 206-07). Dr. Meehan thereafter filled out a Medical Needs form in which he indicated that Plaintiff would need monthly treatment for his fractures for the next 9-12 months and that Plaintiff was nonweightbearing as to both of his legs. He also noted that Plaintiff was non-ambulatory, would need a wheelchair van, and would need assistance with meal preparation, shopping/errands, laundry, and housework. Dr. Meehan estimated that Plaintiff would be unable to work for 4 to 6 months. (Tr. 282-83).

Plaintiff was seen by Dr. Meehan on September 9, 2004. Plaintiff complained of back pain, exacerbated by sitting in a wheelchair, and of right ankle pain, which he rated as a 5 to 6 out of 10. Plaintiff reported that he did not have any significant pain in his left calcaneus. (Tr. 295). An examination revealed that Plaintiff could move his right ankle from 0 to 20 degrees upon plantar flexion. He had mild tenderness and pain at the extreme ranges of motion but his motor strength and sensation were intact. *Id.* Plaintiff's left calcaneus showed mild tenderness

but Plaintiff had intact motor strength and sensation in his left lower extremity. *Id.* Dr. advised that Plaintiff continue wearing a short-leg cast for his right leg and an Ortho-last sprint on his left foot. He remained nonweightbearing as to both of his lower extremities. (Tr. 296).

On September 13, 2004 Plaintiff was examined at the Sinai-Grace Hospital by Dr. A. Levi. Plaintiff told Dr. Levi that his brother had assaulted him by beating him in the face with his fists, throwing glass at him, and hitting his back with a crate. (Tr. 272). Plaintiff had minor lacerations on his leg, thigh and left foot. Plaintiff had full range of motion in his lower extremities and he could move his left toes without any difficulty. (Tr. 273). It was noted that Plaintiff smelled of alcohol. Plaintiff's lacerations were treated and he was released. *Id.*

Plaintiff was seen by Dr. Meehan on September 23, 2004. He noted that Plaintiff was doing "quite well", was using an Ortho-last splint for his left foot, and had been attending physical therapy. (Tr. 293). An examination revealed that Plaintiff's could move his right ankle from neutral to 15 degrees upon plantar flexion. He was neurovascularly intact. Plaintiff had completely intact motor strength and sensation in his lower left extremity. *Id.* Dr. Meehan advanced Plaintiff to weightbearing as tolerated on his right leg but kept Plaintiff as nonweightbearing as to his left leg. He also provided Plaintiff with a CAM boot walker for his right ankle and he gave Plaintiff a pair of crutches to use at physical therapy. (Tr. 294).

Plaintiff was seen again at Sinai-Grace Hospital on September 27, 2004 complaining of lower back pain. (Tr. 278). An examination of Plaintiff's lower lumbar spine showed significant scoliosis, tenderness, and muscle spasms. However, Plaintiff had full range of motion in his

-5-

lower extremities.  It was noted that Plaintiff had a walking boot cast on his right leg and a posterior mold on his left leg.  An x-ray of Plaintiff's lumbar spine showed no fractures, dislocation, or disc space narrowing.  (Tr. 279-80).

Dr. Meehan saw Plaintiff in October 2004.  Dr. Meehan noted that Plaintiff was undergoing physical therapy for his foot injuries.  He was transferring weight bearing on his right leg as tolerated and was ambulating short distances using parallel bars.  An examination revealed that Plaintiff right ankle had dorsiflexion to neutral, plantar flexion to 20 degrees, and inversion and eversion to 5 degrees.  His sensations were intact.  Plaintiff had a normal range of motion in his left foot except for dorsiflexion to neutral and he was neurovascularly intact although some edema and tenderness were noted.  (Tr. 290).  Dr. Meehan prescribed a walker, which Plaintiff could not afford due to lack of insurance.  *Id.*  Dr. Meehan subsequently advanced Plaintiff to weightbearing on both legs as tolerated.  Plaintiff was instructed to transfer his right leg Cam boot walker to his left leg and he was given an ankle brace for his right ankle to be worn with a tennis shoe.  (Tr. 291).

Plaintiff was seen by Dr. Meehan in December 2004 who reported that Plaintiff still complained of pain in his feet and that Plaintiff ambulated with a cane.  (Tr. 288).  Plaintiff's range of motion was 30 degrees in both feet and he had noticeable calf atrophy.  However, Dr. Meehan noted that Plaintiff's fractures were healed.  Dr. Meehan discontinued Plaintiff's Cam boot walker and gave Plaintiff a prescription for bilateral neoprene ankle sleeves, physical therapy, and Vicodin.  Dr. Meehan indicated that Plaintiff would be able to return to work on

February 3, 2005.[2] He also noted that Plaintiff's injuries would likely limit him for the next year to year and a half and that it might be difficult for Plaintiff to engage in standing or prolonged walking in the future.  Dr. Meehan suggested that Plaintiff might need to seek a sit-down job. (Tr. 284, 288).

B.    Plaintiff's Mental Health Treatment

Dr. A. Shah, a psychiatrist, performed a consultative evaluation of Plaintiff on November 5, 2002.  Plaintiff told Dr. Shah that he began to feel depressed in 1986 after he was shot several times by his brother's friends.  He said that he was in a coma for a few weeks, underwent four or five surgeries, and was paralyzed for many years.  (Tr. 166).  Plaintiff reported that he had depressive episodes that lasted for days to weeks and that he was unable to work because of his gunshot wounds and back pain.  Plaintiff stated that recently he would easily become angry, irritable, and forgetful.  Plaintiff also stated that he could not sleep and had nightmares and flashbacks.  He also told Dr. Shah that he had suicidal ideations constantly and had attempted suicide in the past.  Plaintiff also indicated that he heard voices and felt that he would hurt his father or brother because he believed that they had not protected him from the shooting.  *Id.*

Plaintiff further reported that he had recently finished a 90-day rehabilitation program for his cocaine abuse and had been clean for 6 months.  He denied any heroin, marijuana, or

_____

[2]    Dr. Meehan's note actually indicates February 3, 2004, which the Court assumes was a typographical error.

-7-

intravenous drug abuse. (Tr. 166-67). Plaintiff also indicated that he had not been hospitalized for any psychiatric reasons and that he did not take any psychotropic medications. (Tr. 167).

Dr. Shah noted that Plaintiff had good contact with reality and his insight was fair. However, he had decreased motivation and activity, a low self-esteem, and a blunted affect. He also tended to minimize his symptoms and avoided eye contact. (Tr. 167). Plaintiff's thoughts were spontaneous and organized albeit circumstantial. Plaintiff was also oriented as to time, person, and place. He could repeat 3 out 5 numbers forward and 2 out 5 numbers in reverse sequence. He was able to remember 2 out 3 objects after five minutes. Plaintiff could not recall the current president but could name 2 prior presidents and he could only name 3 out of 5 major cities. Plaintiff claimed that he could not perform simple mathematical calculations such as 5 + 4 or 6 x 7 and that he did not know the answer to various questions regarding abstract thinking, judgment, or similarities/differences. (Tr. 168).

Dr. Shah subsequently diagnosed Plaintiff with major depressive disorder, recurrent and with psychotic features, probable post-traumatic stress disorder ("PTSD"), and cocaine and alcohol abuse by history. She assigned him a Global Assessment of Functioning ("GAF") score of 45 and indicated that his prognosis was fair. (Tr. 168).

Another consultative evaluation took place in March 2003 by Dr. Fook Ning Leung. Plaintiff told Dr. Leung that he was unable to work due to severe back pain. He also stated that he was only taking over-the-counter medication but it did not seem to work. (Tr. 174). Plaintiff reported that he had been using marijuana and crack cocaine since he was 19 years old. He also

indicated that he had been in four treatment programs, went to NA meetings every day for the past six months, and that he had last used drugs six months ago. (Tr. 174-75). Plaintiff also reported mentally-related symptoms similar to those stated to Dr. Shah. (Tr. 175-76).

Dr. Leung observed that Plaintiff had good eye contact, no unusual mannerisms, and no apparent difficulty with remembering things. (Tr. 175). He further noted that Plaintiff was in contact with reality and had good insight but that he had decreased motor activity and motivation, a low self-esteem, and an increased dependency upon others. Dr. Leung also reported that Plaintiff's speech was spontaneous, logical, and well-organized albeit circumstantial. He also had some pressured speech. (Tr. 175). Plaintiff was oriented as to time, person, and place. He was able to correctly recall 6 digits forward and 3 digits backwards and he could remember 3 out 3 objects after three minutes. (Tr. 176). Plaintiff could name the current president but not any other recent presidents and he could only recall the names of 2 large cities. He was also able to engage in abstract thinking, to articulate the similarities and differences between objects, and to exercise judgment. *Id.*

Dr. Leung subsequently diagnosed Plaintiff with major depression with psychotic features and chronic PTSD. He assigned Plaintiff a GAF score of 45 and indicated that Plaintiff's prognosis was fair. (Tr. 176).

On April 22, 2003 Plaintiff was admitted into the emergency room following a drug overdose. (Tr. 215-22). Plaintiff's friends reported that Plaintiff had been drinking alcohol and taking heroin and cocaine and that he was depressed because his wife had left him. (Tr. 218,

-9-

221).  Plaintiff claimed that his friends drugged him because they wanted to steal his car.  (Tr. 216).  He also admitted to using crack cocaine "every now and then."  *Id.*  Plaintiff was treated and subsequently released on April 30, 2003 with advice to follow up with psychiatry and to seek outpatient help for his depression.  (Tr. 216-17).

In May 2003 the state requested that Dr. Donald Tate, a licensed psychologist, review Plaintiff's record.  (Tr. 140-157).  Dr. Tate determined that Plaintiff had three documented mental disorders: (1) an affective disorder (major depression with psychotic features); (2) an anxiety-related disorder (PTSD); and (3) a substance addiction disorder.  (Tr. 140, 143, 145, 148).  Dr. Tate concluded that Plaintiff had mild restrictions of activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  He also noted that Plaintiff had no episodes of decompensation for an extended period.  (Tr. 150).  Dr. Tate further opined that Plaintiff was capable of performing simple, unskilled work despite his mental impairments.  (Tr. 157).

Plaintiff was evaluated by Dr. Renee Applebaum, a licensed psychologist, on November 19, 2004.  Plaintiff told Dr. Applebaum that he had abused drugs, specifically crack cocaine and heroine.  He stated that he had been in recovery for the past 17 years and had relapsed 3 times with the most recent relapse involving crack cocaine.  (Tr. 285).  Plaintiff also told Dr. Applebaum that he last attempted suicide in June 2003 when he learned that his wife wanted out of their marriage.  He stated that he drank beer while doing heroine.  He was subsequently

-10-

hospitalized for seven days.  Plaintiff denied any current suicidal ideation.  Plaintiff also reported to Dr. Applebaum that he heard voices telling him to kill others.  (Tr. 286).

Dr. Applebaum indicated that Plaintiff required an intensive course of in-patient mental health treatment and referred him to his local emergency room for that treatment.  Dr. Applebaum subsequently diagnosed Plaintiff with major depression, recurrent and severe with psychotic features, and polysubstance dependency by history.  (Tr. 286).

On December 10, 2004 Dr. Wasim Rather filled out a monthly re-evaluation form.  (Tr. 297-98).  Dr. Rather noted that Plaintiff had been depressed and suicidal and had ended up in the Detroit Receiving Hospital Crisis Center for a few days.  Plaintiff was reportedly on anti-depressants and feeling better.  Dr. Rather also noted that Plaintiff was to continue his appointments with Dr. Applebaum for his depression.  *Id.*  Dr. Rather opined that Plaintiff was totally disabled due to his mental and physical disabilities.  *Id.*

V.   **HEARING TESTIMONY**

A.   **Plaintiff's Testimony**

Plaintiff was 36 years old when he testified before the ALJ and he had a 12th grade education.  (Tr. 316-17).  He told the ALJ that he worked for a short period in 2002, 2003, and 2004.  (Tr. 318, 331-36).  He testified that he did not drive and that his driver's license had been suspended for unpaid parking tickets and drag racing.  (Tr. 320-21).  Plaintiff stated that the last time he used drugs was in February 2001.  He also testified that he was in jail for felonious assault in 1996, was on probation in 1989 or 1990 for a drug possession

charge, and was in jail in 2003 for a probation violation. (Tr. 328, 338). Plaintiff testified that he started to have symptoms of depression in 1986. He stated that he would get angry, especially at his brother. Plaintiff also said that he had homicidal thoughts and would hear voices and that he would isolate himself from others about once a month for three or four days. Plaintiff also stated that he had been seeing Dr. Applebaum for the past month and the doctor ordered him to check into a psychiatric hospital, which he did. (Tr. 329-330, 335, 344, 346). After his hospitalization, he resumed care with Dr. Applebaum who diagnosed Plaintiff with major depression and had prescribed Effexor. (Tr. 330). Plaintiff testified that aside from his felonious assault conviction, he had also hit a man in the head with his cane the previous week and often had yelling matches with his family members. (Tr. 347).

### B. Vocational Expert's Testimony

Raymond J. Dulecki, a rehabilitation counselor, testified as a vocational expert at the hearing. (Tr. 351-52). The ALJ asked Mr. Dulecki to testified as to what jobs would be available for an individual of Plaintiff's vocational and educational background who could perform light work that involved: (1) occasional crouching, kneeling, crawling, and working overhead with the right arm; (2) no use of ropes, ladders, or scaffolds; and (3) no more than incidental contact with the general public, meaning no work that entailed regular and routine servicing of the public. Mr. Dulecki testified that such an individual could perform unskilled, janitorial work, stock positions and visual inspector jobs totaling 30,000 in southeast Michigan. (Tr. 353-54).

-12-

The ALJ also asked Mr. Dulecki about sedentary work would be available to the same hypothetical individual.  Mr. Dulecki testified that such an individual could perform visual inspector, handpackager, or station assembler jobs, which totaled 6,500 in southeast Michigan.  (Tr. 354).

## VI.    LAW AND ANALYSIS

### A.    STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions.  Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to  try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole.  *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).   If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where

substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

### B.     FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

> (1)    he was not presently engaged in substantial gainful employment; and
>
> (2)    he suffered from a severe impairment; and
>
> (3)    the impairment met or was medically equal to a "listed impairment;" or
>
> (4)    he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work. If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391.

### C.     ARGUMENT

The ALJ determined that Plaintiff was not disabled prior to August 3, 2004 and that he had the RFC to perform a range of unskilled, light work. (Tr. 21). As previously noted, Plaintiff does not challenge this determination. The ALJ also concluded that although Plaintiff's

condition had deteriorated as of August 4, 2004 due to Plaintiff's ankle and calcaneal fractures, Plaintiff was not disabled because Plaintiff's impairments did not meet the 12-month durational requirement necessary to establish disability.  Plaintiff challenges this determination.

At step three of the above-cited sequential analysis, a claimant will be found disabled regardless of other factors if he or she can demonstrate that his impairment meets the 12-month durational requirement and "meets or equals a listed impairment." 20 C.F.R. § 404.1520(a)(4)(iii) & (d); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c. The ALJ determined that, even assuming Plaintiff's fracture impairments met the criteria of Listing 1.06, Plaintiff did not meet the 12-month durational requirement to establish disability.  The ALJ based his determination upon Dr. Meehan's statement that Plaintiff's need for medical assistance with  meal preparation, shopping/errands, and housework would not last more than 6 months and that while Plaintiff would likely be limited for 12 to 18 months due to his fractures, it would only be difficult for him to stand or perform prolonged walking. (Tr. 21-22).  The ALJ also noted that Dr. Meehan had suggested that Plaintiff seek a "sit-down type of job", that Plaintiff's fractures were well-healed by December 2004, and that Plaintiff was also walking with a cane by December 2004. (Tr. 22).

Plaintiff does not dispute the ALJ's findings that by December 2004 Plaintiff's fractures had healed and that Plaintiff was walking with a cane.  Rather, Plaintiff asserts that the ALJ's interpretation of Dr. Meehan's statements is clearly erroneous, warranting a remand for a reward of benefits.  According to Plaintiff, Dr. Meehan actually opined that Plaintiff would need

medical assistance for 9 to 12 months and that Plaintiff would not reach his maximum recovery from his fractures for at least 12 to 14 months *after* which he would only be able to engage in sedentary work.

A review of Dr. Meehan's statements reveals that the ALJ's interpretation was not clearly erroneous. Dr. Meehan noted that Plaintiff would need some type of medical treatment for his fractures for 9 to 12 months. However, he did not indicate any specific time limitation as to how long he believed Plaintiff would need assistance with activities of daily living. Rather, he noted that Plaintiff would not be able to work at any type of job for the next 4 to 6 months. Based on these statements as a whole, the ALJ therefore reasonably concluded that while Plaintiff may need treatment for his fractures for 9 to 12 months, he would need medical assistance, meaning help with daily activities, for no more than 6 months.

In December 2004 Dr. Meehan opined that Plaintiff would be able to return to work by February 3, 2005, which fell within his previous 4 to 6 month estimation. Dr. Meehan indicated, however, that Plaintiff would likely be limited in his ability to stand or engage in prolonged walking for the next 12 to 18 months so he should seek a sit-down job. Had Dr. Meehan believed Plaintiff could not engage in even sedentary work for another 12 to 18 months, as Plaintiff avers, then it would not have reasonable for him to have opined that Plaintiff could return to work by February 2005. Furthermore, Dr. Meehan's statement regarding Plaintiff's

limitations, standing alone, do not support Plaintiff's argument. Rather, they support the ALJ's determination that Plaintiff had the RFC to only perform sedentary work as of August 4, 2004.[3]

Plaintiff also asserts that the ALJ erred by finding that Plaintiff was not disabled as of September 2, 2001 due to his mental impairments. Specifically, Plaintiff contends the ALJ failed to: (1) find that he had an anxiety-related disorder (post-traumatic stress disorder); (2) defer to the opinions of Dr. Shah and Dr. Leung that Plaintiff was disabled; and (3) consider that Dr. Applebaum required Plaintiff to have inpatient mental health treatment.

### 1. Diagnosis of PTSD

Plaintiff contends that the ALJ's determination that he was not disabled as a result of a mental impairment was erroneous because the ALJ failed to find that Plaintiff suffered from PTSD. Drs. Shah, Leung, and Applebaum each examined Plaintiff on one occasion. Dr. Shah diagnosed Plaintiff with "probable" PTSD, Dr. Leung diagnosed Plaintiff with chronic PTSD, and Dr. Applebaum did not diagnose Plaintiff with PTSD. The ALJ accurately stated the doctors' diagnoses. However, without explanation, the ALJ found that Plaintiff did not have PTSD. Plaintiff asserts that this finding was contrary to the objective, medical evidence. Dr. Leung's diagnosis provides objective, medical evidence to support the conclusion that Plaintiff had

---

[3] Plaintiff also invites the Court to remand the case to "see what did happen in the 12 months post injury." Plaintiff had an opportunity to present new evidence after the hearing but did not do so. Plaintiff has also not even suggested to this Court that any new evidence actually exists that would support a remand. Plaintiff's invitation is therefore declined.

PTSD.[4]   However, Dr. Applebaum's failure to include such a diagnosis equally supports a determination that he did not.   It is the function of the ALJ, not this Court, to weigh the evidence and to resolve any conflicts.  *Brainard,* 889 F.2d at 681.  Given the evidence before the ALJ, the Court concludes that the ALJ's resolution was not erroneous.

Even assuming the ALJ committed an error, such an error was harmless in this case.  The mere fact that Plaintiff was diagnosed with PTSD does not equate with a finding of disability. *See Foster v. Brown*, 853 F.2d 483, 489 (6th Cir. 1988).  Rather, the Commissioner has prescribed rules for evaluating the severity of a mental impairment to determine whether the impairment is disabling.  *See* 20 C.F.R. § 404.1520a.  The Commissioner first determines whether there is a medically determinable mental disorder specified in one of nine diagnostic categories. *See Ibid.*; 20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.00A.  The clinical findings are referred to as the "A" criteria.  Then the Commissioner measures the severity of a mental disorder in terms of functional restrictions, known as the "B" criteria, by determining the frequency and intensity of the deficits.

According to 20 C.F.R. § 404.1520a(c)(3), the "B" criteria require an evaluation in four areas with a relative rating for each area.  Thus, the Commissioner must evaluate deficits in activities of daily living, social functioning, and persistence, concentration, or pace and rate those on a five-point scale ranging between none, mild, moderate, marked, and extreme.  The

---

[4]       Dr. Shah's diagnosis of "probable" PTSD was equivocal.  Dr. Tate concluded that Plaintiff had PTSD but this was only based upon a review of Plaintiff's evaluation by Dr Leung.

fourth area of deterioration or decompensation in work or work-like settings calls for a rating of never, one or two, three, and four or more.  20 C.F.R. § 404.1520a(c).

An anxiety-related disorder is a listed impairment under the regulations.  20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.06.  To satisfy the "B" criteria for this listing, the claimant must establish two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  Plaintiff points to no evidence that his PTSD resulted in any of these conditions.  Furthermore, the ALJ undertook an analysis of the same "B" criteria when considering Plaintiff's affective disorder and concluded that Plaintiff did not have marked restrictions in any of these above-mentioned areas and that there was no evidence of decompensation.  (Tr. 19-20; *See* 20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.04).  Plaintiff has not challenged these findings.[5]

The regulations also provide that a claimant may be found disabled even if his or her condition is "not equivalent in severity to the criteria of any listing", if the claimant nevertheless

---

[5]      An anxiety-related disorder will also be found disabling if the claimant meets the "A" criteria for the Listing and the "C" criteria, which is a complete inability to function independently outside the area of one's home.  20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.06. The inability to function must have resulted from the mental disorder.  *Id.* at § 12.00A. Plaintiff also does point to any evidence that would support such a finding.  Furthermore, the record shows that Plaintiff had the ability to work part-time jobs even after he was diagnosed with PTSD and for a period of time he attended NA meetings regularly, which indicates that he was not completely unable to function outside of his home.

lacks the RFC to perform substantial gainful activity. 20 C.F.R. Pt. 404. Subpt. P, App. 1 §

12.00A. The ALJ undertook this analysis in relation to Plaintiff's affective disorder and

polysubstance abuse disorder and determined that despite Plaintiff's mental impairment, he had

the RFC to do unskilled work that did not involve more than incidental contact with the general

public. Plaintiff has also not challenged this finding or suggested how his PTSD imposed any

additional restrictions upon his ability to work which were not already considered by the ALJ.

Based upon the foregoing, the Court finds no basis to overturn the ALJ's determination.

### 2.   <u>Alleged Finding of Disability By Drs. Shah and Leung</u>

Plaintiff argues that Drs. Shah and Leung assigned Plaintiff a GAF score of 45, meaning

that Plaintiff was disabled and that the ALJ erred by failing to defer to the doctors' opinions

regarding his disability. Neither doctor actually expressed an opinion that Plaintiff was disabled

and Plaintiff provides no authoritative support for his argument that an individual must be

found disabled based upon a particular GAF score. The GAF scale is used by clinicians to report

an individual's overall level of functioning. *See American Psychiatric Assoc., Diagnostic and*

*Statistical Manual of Mental Disorders* 32 (Text Rev. 4th ed. 2000) ("DSM-IV"). A GAF score

of 41-50 indicates "[s]erious symptoms ⋯ OR any serious impairment in social or occupational

⋯ functioning." *Id.*, at 34. Thus, a GAF scores may indicate problems that do not necessarily

relate to the ability to hold a job. *See id.* Consequently, the GAF score alone is not evidence of

an impairment seriously interfering with claimant's ability to work. *See Howard v. Comm'r of*

*Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (while a GAF score may be of "considerable help,"

it is not "essential" to determining an individual's residual functional capacity.); *see also Kornecky v. Comm'r of Soc. Sec.*, 2006 WL 305648 **13-14 (6th Cir. 2006) ("[A]ccording to the [DSM-IV] explanation of the [GAF] scale, a score may have little or no bearing on the subject's social and occupational functioning.... [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a [GAF] score in the first place.").[6]

Plaintiff's GAF scores, when considered with the record as a whole, do not undermine the ALJ's ultimate conclusions concerning Plaintiff's ability to do unskilled work that involved no more than incidental contact with the public.  Drs. Shah and Leung did not provide any opinion that Plaintiff's mental impairments resulted in particular work-related limitations.  Moreover, as noted by the ALJ, the objective evidence did not show that Plaintiff was prescribed any psychotropic medications or that he was participating in any regular mental health treatment or counseling until December 2004.  Plaintiff was also able to work various jobs during the relevant time period.  He did not testify that he had to quit these jobs due to any mental impairment.  Plaintiff also told Drs. Shah and Leung that he was unable to work due to physical pain but not his mental condition.

### 3.   Plaintiff's Recommended Inpatient Treatment

Plaintiff also asserts that the ALJ should have found Plaintiff disabled as a result of Dr.

---

[6]      The Commissioner also has declined to endorse the GAF score for use in the Social Security disability programs, indicating that the scores have no "'direct correlation to the severity requirements of the mental disorders listings. " 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000).

Applebaum's recommendation that Plaintiff have in-patient mental health treatment. The ALJ noted this recommendation but also stated that there was no objective documentation that Plaintiff actually followed through with the recommended treatment. Plaintiff contends that the ALJ erroneously overlooked Dr. Rathur's notes which confirm that Plaintiff received the treatment at the Detroit Receiving Hospital ("DRH") and that Plaintiff was taking anti-depressants. There is no indication in Dr. Rathur's notes, however, as to whether the doctor's statement was based upon records that he reviewed or upon Plaintiff's own statements and the record does not contain any documents from the DRH confirming Plaintiff's hospitalization or from Dr. Applebaum regarding a prescription for an anti-depressant.

Furthermore, Plaintiff fails to articulate how any of these facts undermine the ALJ's determination that Plaintiff's mental impairments were not disabling. Assuming Plaintiff was hospitalized and began anti-depressant medication sometime after he met with Dr. Applebaum on November 19, 2004, such facts would not affect the ALJ's findings regarding Plaintiff's non-disability prior to that date. Moreover, these facts do not undermine the ALJ's determination that Plaintiff was not disabled post-November 19, 2004. Plaintiff provides no legal authority that holds that a short stint in the hospital for mental health treatment or that the taking of anti-depressant medication renders one mentally disabled. Indeed, Dr. Rathur's notes only indicate that Plaintiff's use of anti-depressants improved his condition. Furthermore, Plaintiff does not argue that these facts undercut the ALJ's RFC finding, which did account for Plaintiff's mental

impairments.  Based upon the foregoing, the Court does not see any basis for overturning the

ALJ's decision.

## VII.    RECOMMENDATION

The Commissioner's decision is supported by substantial evidence.  Defendant's

Motion for Summary Judgment (Docket # 7) should be **GRANTED**.  Plaintiff's Motion for

Summary Judgment (Docket # 6) should be **DENIED** and his complaint **DISMISSED**.

Either party to this action may object to and seek review of this Report and

Recommendation, but must act within ten (10) days of service of a copy hereof as provided

for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections

constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985);

*Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections

which raise some issues but fail to raise others with specificity will not preserve all

objections that party might have to this Report and Recommendation.  *Willis v. Secretary*,

931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the*

*United States District Court for the Eastern District of Michigan*, a copy of any objection

must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: January 19, 2007                s/ Mona K. Majzoub
                                       **MONA K. MAJZOUB**

                                       **UNITED STATES MAGISTRATE JUDGE**




<u>**PROOF OF SERVICE**</u>

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.


Dated: January 19, 2007                s/ Lisa C. Bartlett

                                       Courtroom Deputy